**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| MICHAEL MARGOLIS, | ) | |
| on behalf of himself and others | ) | |
| similarly situated, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:07-cv-1648-RMC |
| | ) | |
| U-HAUL INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

_____)

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
TO STRIKE CLASS ALLEGATIONS AND TO DISMISS THE COMPLAINT**

Plaintiff brings this action against Defendant, U-Haul International, Inc. ("U-Haul") to remedy deceptive advertising and misrepresentations/omissions regarding its truck rental policies. Plaintiff brings claims under the District of Columbia Consumer Protection Procedures Act ("CPPA" or "Act") and for unjust enrichment. To encourage private enforcement of this liberally-construed, remedial statute, the CPPA contains a private attorney general provision, which allows individuals who experience a violation of the CPPA to bring an action in the "interests of…the general public." D.C. Code § 28-3905(k); _see also_ 28-3901(b), (c). Plaintiff brings this action under the private attorney general provision of the Act. Because this is _not_ a class action, Defendant's motion to strike class allegations is misplaced, and should be denied.

The broad remedial reach of the CPPA extends to deceptive practices whether or not the parties have a contract. Defendant argues that breach of contract claims and a class action are the only appropriate remedies for Plaintiff. But Plaintiff is the "master of

his Complaint"[1] and can choose whether to bring a breach of contract claim, a CPPA

claim, and/or a claim for unjust enrichment. *See Rowan Heating-Air Conditioning-Sheet*

*Metal, Inc. v. Williams*, 580 A.2d 583, 584-86 (D.C. 1990) (sustaining trial court award

of damages for breach of contract, and punitive damages under CPPA). Plaintiff chose to

bring CPPA claims to vindicate both his claims and the claims of the "general public" as

authorized by the CPPA, and to bring an unjust enrichment action.

Although Defendant would apparently like to force Plaintiff to bring other claims,

Plaintiff has met his pleading requirements for the claims that he has actually brought.

Specifically, U-Haul engaged in actionable false advertising by claiming that it

maintained the "[n]ewest trucks for household movers," when in fact it has a pattern and

practice of keeping predominantly older, dilapidated moving trucks in its fleet. *See* D.C.

Code § 28-3904. Additionally, Defendant's standing argument fails, because actual

reliance is not a requirement under the CPPA, and because Plaintiff suffered actual

cognizable injuries. *See* D.C. Code § 28-3904 ("It shall be a violation of this chapter,

whether or not any consumer is in fact misled, deceived or damaged thereby . . ."); *Wells*

*v. Allstate Insurance Co.*, 210 F.R.D. 1 (D.D.C. 2002); *Williams v. Purdue Pharma Co*.,

297 F. Supp 2d 171, 177 (D.D.C. 2003). Moreover, the existence of a contract does not

foreclose recovery under the CPPA, or under the theory of unjust enrichment. Like most

consumer protection statutes,[2] the CPPA is broader than contract law and ***provides relief***

---

[1] *See Caterpillar Inc., v. Williams*, 482 U.S. 386, 392 (1987) (holding that the plaintiff is the master of the complaint).

[2] *See generally Kattar v. Demoulas*, 739 N.E.2d 246, 257 (Mass. 2000) (consumer protection act provides additional substantive rights and is not dependent upon common law concepts such as breach of contract); *Dixon v. Bryan*, 1998 Tenn. App. LEXIS 847 (Dec. 15, 1998) (signing a contract that listed someone else as seller does not bar buyer's consumer protection claim that defendant misrepresented himself as the owner).

*in addition to existing contractual remedies*.  *See* D.C. Code § 28-3905(k)(2) ("The remedies or penalties provided by this chapter are cumulative and in addition to other remedies or penalties provided by law.").[3]

**Summary of the Facts:**
**Defendant Engages in a Pattern and Practice of Unfair or Deceptive Trade Practices**

U-Haul advertises that one of its "advantages" is that it provides the "[n]ewest trucks for household movers!" Compl. ¶ 7 & Ex. A.  Mr. Margolis saw such an advertisement by U-Haul, and made a reservation with U-Haul in the District of Columbia for a moving truck and a tow dolly, for June 29, 2005 through July 6, 2005.  *Id.* ¶ 8, 11, 14.  On June 29, 2005, when Plaintiff arrived, the U-Haul outlet did not have the tow dolly available and provided Plaintiff with an old, dilapidated moving truck with over 233,420 miles on the odometer.  *Id.* ¶ 12, 13.  Plaintiff had to travel to a U-Haul in Rockville, Maryland to acquire a tow dolly.  *Id.* ¶ 13.  After Plaintiff took the moving truck home, it began to leak oil and needed maintenance.  *Id.* ¶ 16.  This delayed his departure to Texas.  *Id.*

Later, on June 30, 2005, during his trip to Texas, exhaust fumes began to enter the cabin, and Plaintiff was forced to spend most of the day waiting for U-Haul to make repairs.  *Id.* ¶ 17.  Again, on July 3, 2005, the exhaust problem worsened, and he was

---

[3] *See also Byrd v. Jackson*, 902 A.2d 778,781 (D.C. 2006) (finding that a merchant could be held liable under the CPPA whether or not the parties entered into a formal contractual relationship); *Rowan Heating-Air Conditioning-Sheet Metal, Inc. v. Williams*, 580 A.2d 583 (D.C. 1990) (plaintiff recovered under breach of contract theory and under CPPA).

An examination of the list of the CPPA's prohibited practices conveys that a contract between the parties cannot bar recovery under the CPPA.  Many of the prohibited practices specifically involve contracts.  *See* D.C. Code § 28-3904 (n), (q), (r), (z).

forced to stay overnight in Louisiana while waiting for U-Haul to repair the truck.  *Id*. ¶18-20.  Eventually, U-Haul provided a replacement moving truck.  *Id*. ¶ 20.  Over the telephone, a U-Haul representative assured Plaintiff that he would be reimbursed for the rental of the truck and cost of his hotel stay in Louisiana, but he never received the refund.  *Id*. ¶ 21.  Instead of a refund, U-Haul charged his credit card without authorization an additional $1,025.69 for allegedly returning the moving truck late and to the wrong drop-off location even though he returned the truck a day early to the exact location where U-Haul had directed him.  *Id*. ¶ 23-25.

Mr. Margolis's experience is not unique.  Compl. ¶ 9-10.  Indeed, as a recent exposé in the *Los Angeles Times* documents, the renting of old and broken down vehicles is U-Haul's standard operating procedure.  *See* Ex. 1 (Myron Levin and Alan C. Miller, Danger in Tow: Upkeep Lags in U-Haul's Aging Fleet, L.A. Times, June 25, 2007) *cited in* Compl. ¶ 9-10.  According to the article, U-Haul has several models of trucks. Focusing on only one particular model, Levin and Miller found that U-Haul has *over* 4,500 trucks that it rents to customers even though they have been on the road for 200,000 miles or more.  U-Haul also fails to maintain its older trucks, sometimes foregoing safety checks and falsifying repair records at the expense of their customers. The *Times* article describes the experiences of numerous customers who received older trucks from U-Haul and who lost time and money while waiting for significant repairs to the trucks.  Clearly, U-Haul unjustly profits from its false claims about its new trucks, when in fact it has a pattern and practice of keeping old trucks on the road without regard to their condition.

## Legal Standards

A court may strike any "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Courts disfavor a motion to strike because it seeks an "exceptional" result. *U.S. ex rel. Debra Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 34-35 (D.D.C. 2007). Movant must "shoulder a formidable burden." *Id*. In the instant motion, Defendant fails to meet this heavy burden as Plaintiff's claims in the interest of the general public help carryout the broad remedial purpose of the CPPA.

The standard of review on a motion to dismiss is also stringent. Dismissal on the pleadings effectively denies plaintiffs, and in this case, the general public, their day in court. Under the traditional rule, a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), *as modified by Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007); *Chelsea Condominium Unit Owners Assoc. v. 1815 A. St.*, 468 F. Supp. 2d 136, 145 (D.D.C. 2007). The Court of Appeals for this Circuit has reversed orders granting a motion to dismiss, holding that "a plaintiff need not set forth the elements of a prima facie case at the initial pleading stage." *Sparrow v. United Air Lines*, 216 F.3d 1111 (D.C. Cir. 2000); *see also Cooper v. First Gov't Mortgage and Investors Corp.*, 206 F. Supp. 2d 33 (D.C. 2002) (denying defendant's motion to dismiss plaintiff's CPPA claim).

Moreover, in assessing the factual allegations in a complaint, the court is to treat plaintiff's allegations as true, and must grant plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Leatherman v. Tarrant County Narcotics Intelligence*

*and Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (same). Here, Defendant's motion to dismiss flies in the face of the notion of notice pleading and of the well-established standard that the Court must make all inferences in favor of the Plaintiff. Defendant does precisely the opposite, insisting for example that where its advertisement states that it has "Newest vehicles for household movers," what it *really* says is "U-Haul has some of the 'Newest trucks for household movers.'" Def.'s Mem.7. An honest examination of the Complaint, drawing all inferences in favor of the Plaintiff, confirms that Plaintiff has satisfactorily pleaded CPPA and unjust enrichment claims. Accordingly and for the reasons set forth below, Defendant's motion must be denied.

## Argument

### I.    THE COMPLAINT SUFFICIENTLY ALLEGES FACTS THAT SUPPORT A CONSUMER PROTECTION CLAIM ON BEHALF OF THE GENERAL PUBLIC TO ERADICATE IMPROPER TRADE PRACTICES

Plaintiff has filed this action under the CPPA not as a class action, but as a private attorney general action, to remedy improper trade practices.[4] Defendant asks the Court to strike Plaintiff's class allegations, but such allegations do not exist. Instead, Plaintiff seeks relief under the CPPA on behalf of the public in an effort to prevent unlawful trade practices from continuing and to recover monies unjustly obtained by U-Haul through its unlawful practices. As such, Rule 23 is inapplicable to the Plaintiff's Complaint.

---

[4] Plaintiff brought his Complaint in D.C. Superior Court. Defendant removed it to federal court alleging diversity of citizenship and that the amount in controversy exceeds $75,000 and/or that the Plaintiff brought a class action and the amount in controversy exceeds $5,000.

In addition to providing a remedy for improper trade practices, another purpose of the CPPA is to "promote, through enforcement, fair business practices throughout the community." *Shaw v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 141, 147 (D.D.C. 2007). In keeping with its effective enforcement purpose, the CPPA expressly provides for an individual to bring an action "acting for the interests of itself, its members, or the *general public*." D.C. Code § 28-3905(k)(1) (emphasis added). It also allows recovery "*in representative actions*" for "additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice." D.C. Code § 28-3905(k)(1)(E) (emphasis added).

In essence, the statute encourages individuals to act as private attorneys general, assisting the District of Columbia in combating unfair and deceptive consumer trade practices. Notably, the CPPA does not impose any procedural requirements on actions brought on behalf of the general public. Imposition of class action pleading requirements on claims on behalf of the general public would frustrate the substantive enforcement provisions of the CPPA and would run contrary to the legislature's intention that the CPPA be "construed and applied liberally to promote its purpose." D.C. Code § 28-3901(c).

Under the Rules Enabling Act, substantive state legal rights such as a private right of action cannot be altered by federal procedural requirements. *See* 28 U.S.C. § 2072; *see also Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938) (holding that, in federal court, substantive issues are governed by state law); *Douglas v. NCNB Texas Nat'l Bank*, 979 F.2d 1128, 1130 (5th Cir. 1992) (holding that Fed. R. Civ. P. 13(a), regarding compulsory counterclaims, would not be applied where it would affect the ability of parties to decide

which state law remedies to pursue).  To require that all CPPA actions on behalf of the

general public be brought as class actions would unfairly restrict a party's ability to

decide what claims to bring and would discourage consumers from acting as private

attorneys general.  Indeed, the case law supports no such requirement: defendant cites no

authority requiring a CPPA action on behalf of the general public to be filed as a Rule 23

class action.  It is certainly possible that following discovery Plaintiff may seek to amend

the Complaint to include class allegations and specific monetary relief for a class.  If that

occurs, Plaintiff will plead and be subject to Rule 23.  However, Defendant cannot

unilaterally impose procedural class action requirements on the private-attorney-general

Complaint that Plaintiff has actually brought.  Because Defendant has not shouldered its

"formidable burden" to establish that the allegations on behalf of the general public are

"immaterial, impertinent, or scandalous," the motion to strike must be denied.  *See*

*Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d at 35; Fed. R. Civ. P. 12(f).

## II.     PLAINTIFF HAS ADEQUATELY STATED DECEPTIVE TRADE PRACTICES AND UNJUST ENRICHMENT CLAIMS

### A.  The Complaint Sufficiently Alleges Violations of the CPPA

#### 1.  U-Haul's False Advertising and Misrepresentation of its Truck Rental Policies are Actionable Under the CPPA

Plaintiff has alleged that U-Haul engaged in unfair and deceptive trade practices

in violation of the CPPA through false advertising, misrepresenting and omitting facts

regarding truck reservations, failing to honor Plaintiff's truck reservation, refusing to

refund Plaintiff, and charging Plaintiff's credit card $1,025.69 without authorization.

These are precisely the type of acts the CPPA was intended to remedy.  Not only is the

CPPA a "comprehensive statute designed to provide procedures and remedies for a broad

spectrum of practices which injure consumers," but the purpose of the statute is to

"assure that a just mechanism exists to remedy *all* improper trade practices." *District*

*Cablevision Ltd. Partnership v. Bassin*, 828 A.2d 714, 722-23 (D.C. 2003) (emphasis in

original) (quoting D.C. Code § 28-3901(b)(1)).

The Defendant argues that the Complaint must be dismissed because it does not

specify which one of the enumerated "unlawful trade practices" U-Haul violated.  But the

CPPA has no such heightened pleading requirement.  Indeed, such a requirement would

be inappropriate on a motion to dismiss, where the complaint is to be liberally construed,

and all doubts resolved in plaintiff's favor.  To state a claim, a consumer need only allege

an unlawful trade practice.  *Cablevision*, 828 A.2d at 723 (holding that plaintiffs could

predicate their CPPA claim on violation of the common law).  A plaintiff is not required

to identify a specific section of § 28-3904 that Defendant has violated.

Even though the law does not require the plaintiff to point to a particular unlawful

trade practice listed in the Act, the Complaint plainly implicates multiple provisions of

the CPPA.  Defendant's advertising violates the CPPA because it lures consumers into

reasonably thinking they will receive relatively newer trucks capable of performing

without breaking down, when it actually maintains a much older fleet. Compl. ¶ 31.  In

addition to deceptive advertising, U-Haul injures consumers by misrepresenting and

failing to disclose material facts regarding truck rental reservations, such as the age of the

truck, the poor condition of the truck, the location of equipment rented with the truck (in

Plaintiff's case the tow dolly was in Maryland, not in D.C. with the truck), and the

opportunity for a refund (in Plaintiff's case he was promised a refund never received, and

instead U-Haul charged his credit card an additional $1,025.69 without his authorization).

*Id*. Defendant's actions and omissions clearly violate sections (a), (c) – (f), and (h) of

Section 28-3904:

> It shall be a violation of this chapter, whether or not any consumer is in
> fact misled, deceived or damaged thereby for any person to:
>
>> (a) represent that goods or services have a source, sponsorship,
>> approval, certification, accessories, characteristics, ingredients,
>> uses, benefits, or quantities that they do not have;
>> …
>> (c) represent that goods are original or new if in fact they are
>> deteriorated, altered, reconditioned, reclaimed, or second hand
>> or have been used;
>>
>> (d) represent that good or services are of particular standard,
>> quality, grade, style, or model if in fact they are of another;
>>
>> (e) misrepresent as to material fact which has a tendency to
>> mislead;
>>
>> (f) fail to state a material fact if such failure tends to mislead;
>> …
>> (h) advertise or offer goods or services without the intent to sell
>> them or without the intent to sell them as advertised or
>> offered…

*Id.* (emphasis added). This Court has held that "to state a claim" under these sections of

the act, particularly Section 28-3904(e) or (f), the plaintiff need only allege: "(1) the

failure to disclose a material fact or the misrepresentation of a material fact (2) which

would tend to mislead." *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 105 (D.D.C. 2004).

Moreover, under sections (a), (c), (d), and (h), the deceptive practice need not be with

regard to a material fact. As described, Plaintiff has met its burden.

### 2. The Complaint Sufficiently Alleges that U-Haul's Advertising Misrepresents Its Actual Practices

The Complaint alleges that U-Haul misrepresents that its trucks are new when, in

fact it has a practice of keeping older, deteriorated trucks on the road. U-Haul contends

this is insufficient to state a claim under the CPPA. Underlying this argument is U-Haul's position that it never made a misrepresentation. Of course, this is a fact question, not grounds for a motion to dismiss. Perhaps fittingly, in making this argument, U-Haul misrepresents the plain language of its own advertising. The example advertisement attached to the Complaint in Exhibit A states, in a bullet point: "**Newest trucks for household movers!**" Based on this type of advertisement, Plaintiff alleges that U-Haul engages in a false advertising campaign about the relative newness of its moving trucks. Plaintiff's consumer protection and unjust enrichment claims are based on the reasonable expectations that such advertisements create in consumers. Compl. ¶ 31. An advertisement touting "Newest trucks for household movers" certainly would not lead one to expect a vehicle with over 200,000 miles on it, which is what Plaintiff received.

Defendant argues that it never expressly claimed its fleet was the newest as compared to other fleets, never guaranteed that Plaintiff would receive one of the newest trucks, and never guaranteed that Plaintiff or the general public would receive a truck of a particular quality. Def.'s Mem. 6-7. Throughout its brief, U-Haul insists that its advertisements could not have raised any expectation of a relatively new truck in consumers because, U-Haul argues, the advertisements merely mention that it has "***some of the*** 'Newest trucks for household movers!'" *Id*. at 2, 6-7 (emphasis added). To the contrary, U-Haul's advertisements *do not* qualify or limit the number of new trucks in its fleet to "some" trucks. Instead, the example advertisement attached to the Complaint simply states: "Newest trucks for household movers!" Compl. Ex. A. Indeed, by using an unqualified superlative to describe its trucks, U-Haul is making an unequivocal statement that no one has newer trucks than it does, and that one should expect a

relatively new and well-maintained truck when renting from U-Haul. U-Haul's argument, that its advertisement only promises that *some* or even just a few of its trucks are the newest, but the rest could be death traps, simply strains credulity.

More importantly, U-Haul ignores the motion to dismiss standard in making these tenuous arguments. While the meaning, effect, and impact of U-Haul's advertising campaign might be disputed at trial, on a motion to dismiss, all factual inferences must be drawn in favor of the plaintiff. *Leatherman*, 507 U.S. at 164 (1993).

### 3. U-Haul's Misrepresentations and Deceptive Advertising are More Than Mere Puffery

Defendant alleges that Plaintiff cannot bring a claim under the CPPA, because U-Haul's representations about its trucks are mere puffery. This argument fails for two reasons. First, D.C. courts have never held that puffery is non-actionable under the CPPA. Second and more significantly, U-Haul's statements about the age of their trucks are quantifiable, factual representations of specific importance to customers and cannot be considered puffery. D.C. courts have defined puffery as "an expression of opinion" rather than "representations of fact." *Rosenberg v. Howle*, 56 A.2d 709, 711 (D.C. 1948). Moreover, the CPPA recognizes the importance of representations regarding the age of a product and specifically makes it an unlawful practice for a business to misrepresent the age of goods. D.C. § Code 28-3904(c). Whether a moving truck is new or old is a measurable fact, not an opinion. For example, just like airlines, where the age of the fleet is of great importance to customers because it affects reliability and safety, a truck rental customer can be more influenced to do business with the company providing the newest equipment. And just like the airlines, whether U-Haul really does have the newest trucks is objectively knowable.

12

The cases Defendant cites only undercut its argument, because they illustrate the proposition that bald statements of a product's superiority constitute puffery. None of them address matters of more specific importance, such as statements about a product's age. In *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp.2d 24 (D.D.C. 2007), this Court found that Kentucky Fried Chicken's statements that their restaurants serve the "best food" were mere puffery. *See also Presidido Enterprises, Inc. v. Warner Bros. Distributing Corp.*, 784 F.2d 674, 679, 686 (5th Cir. 1986) (concluding that future statements that a film "will be the most want-to-see movie of the year" and will be "your blockbuster for 1978" were puffery); *Park Rise Homeowners Assoc., Inc.*, 155 P.3d 427, 436 (Colo. App. 2006) (holding that a merchant's representation that it provided "quality construction" was puffery, but noting that "statements of existing facts or specific attributes of a product" could sustain a claim under the Colorado consumer protection act).

U-Haul's advertisement about the age of its moving trucks is fundamentally different than statements about the "best food," the superiority of a motion picture, or "quality construction." The age of a moving truck is a quantifiable fact with material significance to the quality of the good provided. A newer moving truck is more reliable, more comfortable and probably safer than an older truck with over 200,000 miles. Underscoring the significance of a product's age in consumer transactions, courts have found that false statements regarding a vehicle's age are actionable under consumer protection laws. *See Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex. 1980) (allowing claim under Texas consumer protection act based on seller's representations that boat was "new" and in "excellent" condition when the boat was actually in poor mechanical condition); *Hogan v. Mason Motor Co.*, 288 P. 200, 202 (Or. 1930) (holding

that statements about the age of a car were not puffery). *See also Fox Industries Inc., v. Natoma Corp.* 766 P.2d 1297 (Kan. Ct. App. 1988) (holding that statements about the age of a machine were not puffery); *Fox v. Wilson*, 507 P.2d 252, 266 (Kan. 1973) (holding that statements regarding the model-year and operability of a piece of machinery was not puffery).

### 4. Plaintiff Sufficiently Alleges Injury from Defendant's Deceptive Trade Practices and has Standing to Bring a Consumer Protection Claim

There is no reliance requirement under the CPPA. A misrepresentation or omission of a material fact is an unlawful trade practice "whether or not a potential purchaser is, in fact, misled" by the misrepresentations or omissions. D.C. Code § 28-3904. So long as the misrepresentations or omissions would tend to mislead a reasonable purchaser, it is an unlawful trade practice and violates the CPPA. *Id.* Indeed, this Court has held that "to state a claim" under § 28-3904(e) or (f), the plaintiff need only allege "(1) the failure to disclose a material fact or the misrepresentation of a material fact (2) which would tend to mislead." *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 105 (D.D.C. 2004). It is not required that the Plaintiff actually be deceived by the misrepresentation in question. *See Wells v. Allstate Insurance Co.*, 210 F.R.D. 1 (D.D.C. 2002).

This approach is consistent with other states' consumer protection statutes. *See e.g. Davis v. Powertel Inc.*, 776 So. 2d 971 (Fla. Dist. Ct. App. 2000) (actual reliance unnecessary in individual and class actions; plaintiff must show that practice is likely to deceive reasonable consumer); *State ex rel. Webster v. Areaco Inv. Co.*, 756 S.W.2d 633 (Mo. Ct. App. 1988) (actual reliance unnecessary); *Varcallo v. Massachusetts Mut. Life*

14

*Ins. Co*, 332 N.J. Super 31, 713 A.2d 807 (N.J. App. Div. 2000) (requiring causal nexus but not reliance).

The cases Defendant cites to contradict the clear statutory language that a consumer need not be misled are inapposite. In *Williams v. Purdue Pharma Co*., 297 F.Supp. 2d 171, 177 (D.D.C. 2003), plaintiffs were individuals who were prescribed the drug OxyContin but were not injured by the drug. Plaintiffs alleged that OxyContin was more addictive than advertised and did not provide 12-hour pain relief as advertised, but plaintiffs did not allege that they failed to receive effective 12-hour pain relief.[5] The Court dismissed the Complaint because the plaintiffs alleged *neither* that they were actually deceived nor that they suffered any particularized and specific injury. 297 F. Supp. 2d at 177. In *Hoyte v. Yum! Brands, Inc*., 489 F. Supp. 2d 24, 28 (D.D.C. 2007), the Court dismissed the Complaint for failure to claim an *injury*, not for failure to claim the Plaintiff was deceived. 489 F. Supp. 2d at 28.

In contrast to plaintiffs in *Williams* and *Hoyte*, Plaintiff Margolis alleges specific damages he actually suffered: U-Haul did not honor his reservation for the tow dolly; it provided an old truck in disrepair when he expected a newer one in reasonable repair; he lost time and money due to the dilapidated moving truck, requiring repairs on three occasions; he had to pay for lodging while waiting for U-Haul to repair the truck; he was not reimbursed for the cost of renting the truck or for the cost of the lodging; and U-Haul wrongfully charged his credit card a fee without his permission based on its own error

---

[5] The Court noted in *Williams* that the plaintiffs also failed to allege that they had seen the deceptive advertisements. 297 F. Supp. 2d. at 177. In the instant motion, Plaintiff has so alleged. Compl. ¶ 8.

concerning the return location and date.  Because Plaintiff was clearly injured, there is no doubt that he has standing to bring a claim under the CPPA.[6]

Lastly, Defendant argues that Plaintiff could not have been deceived because when he arrived to pick up his moving truck he saw that the odometer read 233,420 miles and should have known it was old.  But the CPPA has no "duty to cure" requirement.  It holds the defendant responsible for its deception, not the plaintiff.  To hold otherwise would allow sellers with a complete information advantage to prey on any buyer who does not immediately recognize the problems with a product she is purchasing.  Such a perverse result is not in keeping with the broad remedial goals of the CPPA.

### B.  Plaintiff Margolis Has Satisfactorily Stated a Claim for Unjust Enrichment

The theory of unjust enrichment is a "duty thrust under certain circumstances upon one party to requite another in order to avoid the former's unjust enrichment." *Vereen v. Clayborne*, 623 A.2d 1190, 1194 (D.C. 1993).   An aggrieved customer may bring CPPA, breach of contract, and unjust enrichment claims together or plead in them in the alternative.[7] *See, e.g., Shaw*, 474 F. Supp. 2d 141 (Court permitted plaintiff to bring CPPA and unjust enrichment claims).  Moreover, pleading in the alternative is permitted by the Federal Rules of Civil Procedure, "a court must look beyond how a 'complaint is styled' to determine if facts support any claim for relief under a theory of breach of contract or unjust enrichment."  *Nevius v. Afr. Inland Mission, Int'l*, 2007 U.S.

---

[6] Actually, the Complaint specifically alleges Plaintiff saw the advertisement stating "[n]ewest trucks for household movers!" and that he relied on the advertisement, as he subsequently reserved a moving truck from U-Haul. Compl. ¶ 8, 11.

[7] Remedies under the CPPA are in addition to any other remedies available to a consumer.  *See supra* text accompanying note 3.

Dist. Lexis 70084, at FN 6 (D.D.C. Sept. 24, 2007) (quoting *Miranda v. Contreas*, 754 A.2d 277, 284 (D.C. 2000)) (citing Fed. R. Civ. P. 8(e)(2)).

Defendant essentially claims that the existence of a written contract *ipso facto* prohibits a party from bringing a claim for unjust enrichment for deceptive trade practices. The cases Defendant cites, however, hold otherwise. These cases, *Emerine v. Yancey*, 680 A.2d 1380 (D.C. 1996) and *Wilderness Society v. Cohen*, 267 A.2d 820 (D.C. 1970), suggest at most that the unjust enrichment theory might be unavailable if a party attempts to recover for enrichment expressly covered by the terms of a contract. In *Ermine*, a former employee sought back pay on the basis of a 1989 express contract and a 1990 contract implied in fact. Contrary to U-Haul's suggestion, the *Ermine* Court did not reach the issue of whether recovery for unjust enrichment is available when a contract exists. Instead, in dicta, the Court explained that "where the parties have a contract governing *an aspect* of the relation between themselve*s,* a court will not displace the terms of that contract." *Id.* at 1384 (emphasis added).

In the instant case, Plaintiff seeks recovery under a theory of unjust enrichment because U-Haul obtained business by luring customers with its false and deceptive advertising. Plaintiff alleges that U-Haul was unjustly enriched at his expense and should forfeit its ill-gotten gains. Moreover, Defendant's misrepresentations and false advertisement prohibit it from trying to enforce a contract. *See Wells v. Allstate Insurance Co.*, 2006 U.S. Dist. Lexis 4694, at *15 (D.D.C. Jan. 24, 2006) (explaining that a party who willfully misled the other may not enforce their contract that released the misleading party from liability; also denying the defendant's motion for summary judgment on the plaintiff's CPPA claims).

**Conclusion**

For the foregoing reasons, Defendant's Motion to Strike and Dismiss must be denied in all respects.

Respectfully submitted,

November 7, 2007

/s/Steven A. Skalet_____
Steven A. Skalet (D.C. Bar No. 359804)
Craig Briskin*
Ellen L. Eardley (D.C. Bar No. 488741)
Mehri & Skalet, PLLC
1250 Connecticut Ave., N.W., Suite 300
Washington, DC  20036
(202) 822-5100

*Attorneys for the Plaintiff*
*\*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2007, a copy of the foregoing was served

upon all counsel of record through the Court's electronic filing system and via electronic

mail:

David Zetoony
Bryan Cave LLP
700 13th St. N.W. Ste 700
Washington, D.C. 20005
(202) 508-6030 (phone)

Of Counsel:
Lawrence G. Scarborough, Esq.
Bryan Cave LLP
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004
(602) 364-7137 (phone)

<u>/s/Steven A. Skalet</u>
Steven A. Skalet

# EXHIBIT 1

1 of 1 DOCUMENT

Copyright 2007 Los Angeles Times
All Rights Reserved
Los Angeles Times

June 25, 2007 Monday
Home Edition

**SECTION:** MAIN NEWS; National Desk; Part A; Pg. 1

**LENGTH:** 5103 words

**HEADLINE:** DANGER IN TOW;
Upkeep lags in U-Haul's aging fleet;
Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents.

**BYLINE:** Myron Levin and Alan C. Miller, Times Staff Writers

**BODY:**

THE U-HAUL TRUCK was 19 years old, with nearly 234,000 miles on its odometer. It had a history of problems with its emergency brake and was overdue for a safety inspection.

Talmadge Waldrip, 73, of Forney, Texas, was using it to help his daughter move some belongings in September. He drove to a warehouse and killed the engine. Then he put the manual transmission in gear, set the emergency brake and stepped down from the cab, he told family members later.

Instantly, the truck rolled backward. Waldrip tried to climb back in, but the door knocked him to the pavement. The 6-ton truck rolled over his midsection and dragged him, crushing his pelvis.

Nine months and 14 surgeries later, the once-vigorous Waldrip cannot walk and needs round-the-clock care.

U-Haul International Inc. has denied responsibility and says it's still investigating the cause. Whatever the outcome, the accident shows how the company tries to squeeze the last mile from its vehicles, and how it often fails to meet its own standards for inspecting and maintaining them.

During a yearlong investigation, Times journalists surveyed more than 200 U-Haul trucks and trailers in California and other states and found that more than half were overdue for a company-mandated "safety certification," a check of brakes, tires and other parts typically required every 30 days.

Some safety checks were more than a year overdue.

In response, U-Haul said its fleet of more than 200,000 vehicles is safe and well-maintained. It said it is investing heavily to modernize the fleet and spends about $350 million a year -- about 20% of its rental revenue -- on maintenance and repairs.

U-Haul, the nation's largest do-it-yourself moving company, said its trucks are involved in fewer than four accidents per million miles -- about the same as a federal estimate of the accident rate for all passenger vehicles. The

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

company said the rate for its trailers is even lower.

U-Haul's figures could not be independently verified. No government agency keeps track of accidents involving rental equipment.

The company said its "performance record on the highways of North America says that we are succeeding."

AN OLDER FLEET

AMONG U-HAUL'S 100,000 trucks are many aging, high-mileage vehicles. Many have logged more than 100,000 miles. A recent court filing by U-Haul underscored the fleet's age: A company executive, referring only to the type of truck rented to Waldrip, said 4,595 of them were still on the road with 200,000 miles or more.

U-Haul has purchased about 38,000 new trucks over the last two years and has sold nearly as many older ones. But the company says it does not automatically retire vehicles at a fixed mileage or age.

Penske Truck Leasing, one of U-Haul's two major competitors, says that it replaces up to half its consumer rental fleet every year and that its oldest trucks are about 3 1/2 years old. Budget Truck Rental says the average age of its trucks is 2 to 2 1/2 years.

U-Haul relies on a far-flung network of independent dealers to supplement its 1,450 company-owned rental centers. This has added to maintenance problems.

Most of the 14,500 dealers have no auto service background. They include storage sites, mini-marts, postal supply shops, even liquor stores and laundromats.

Further complicating matters is U-Haul's practice of booking reservations without knowing if it will have trucks and trailers when and where renters want them. The policy leads to long lines of overwrought customers, creating pressure to get equipment back on the road quickly.

Twenty-four former U-Haul employees, including some who collectively oversaw hundreds of rental locations in California and other states, said in separate interviews that basic safety checks were often skipped because of thin staffing and the need to keep trucks and trailers rolling.

U-Haul mechanics on occasion have falsified repair records, listing work they did not perform -- a practice known as "hanging paper," court records and interviews show. U-Haul says this is rare and never tolerated.

The company faces little regulatory scrutiny in the U.S., but Canadian officials have sharply criticized its maintenance practices.

From July 2005 through August 2006, the Ontario Ministry of Transportation inspected about 800 U-Haul trucks and removed 20% from service because of such problems as defective lights, steering and brakes.

The inspectors idled only about 4% of the trucks of other rental firms.

U-Haul said that some vehicles were sidelined for reasons unrelated to their condition, such as a driver lacking a proper license, and that its Canadian operation is safe. The company said it is improving its performance in Canada by adding new trucks, retraining employees and dropping errant dealers.

Ontario Transportation Minister Donna Cansfield said in an interview that U-Haul has a long way to go.

"The bottom line is, people are renting U-Hauls and they're not safe," she said.

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

## TRUCK FAILURES

THE PHRASE "Moving Made Easier" is emblazoned on U-Haul equipment, reflecting what chairman Edward J. "Joe" Shoen calls the company's "strong social purpose."

Customers "need to be dealt with just as fairly and kindly" as possible, Shoen said. "We have a culture of trying to do that. Does that mean it works every time? Of course it doesn't work every time. But it works in the vast majority of times."

Don't tell that to Art McCain.

McCain was concerned when he saw that the odometer in his U-Haul truck read 116,475 miles. But he had confidence in what he called "an internationally known brand," so he drove it onto Interstate 5 in July 2003 to move from El Dorado Hills, Calif., to Upland.

His faith faltered when the vehicle began vibrating. The rear "pitched violently to the left," recalled McCain, 44, a school guidance counselor. "I was able to wrestle the truck, with concerted effort, to the shoulder."

A mechanic dispatched to the scene by U-Haul found that lug nuts and studs were missing from two wheels. McCain said a highway patrol officer told him he was "the luckiest man in the world" not to have been seriously injured.

The truck was towed to a service station, where McCain waited 13 hours for repairs to be completed.

McCain said his anger boiled over when mechanics showed him that two of the truck's inside rear tires were so undersized that "they weren't even hitting the ground."

Asked for comment, U-Haul said the truck was checked and found safe before McCain drove it. The company said it could not explain what happened.

David Driscoll had a close call of his own.

The construction supervisor was moving from Chicago to Los Angeles in 2003. His U-Haul truck broke down in Missouri, and he spent two nights in motels waiting for repairs. He had reached California two days later when a front wheel flew off the truck near Blythe on Interstate 10.

"The wheel tumbled hundreds of yards into the desert as the truck went careening across the highway until it crashed into the side of the road," Driscoll wrote to U-Haul, adding that the wheel was missing a bolt, bearings and retainer pin. "This accident could have cost me or someone else their life."

Driscoll, who was not injured, said he hitchhiked 20 miles through a dust storm to reach a pay phone. He said he was unable to get assistance from U-Haul. Facing a night in the desert, Driscoll called a friend in Los Angeles who drove seven hours round-trip to rescue him.

U-Haul said mechanics made wheel and brake repairs to the truck shortly before Driscoll drove it. "It appears that the repair may have been faulty," the company said.

Driscoll received a partial refund from U-Haul, as did McCain. The Times learned of their experiences from complaints they filed with the Better Business Bureau.

The truck Cheryl Akers rented to move from Michigan to Arizona in 2002 suffered the equivalent of multiple organ failure.

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

There were transmission repairs in Oklahoma and exhaust problems in Texas, she said in an interview and in a consumer complaint to the bureau. Akers, her daughter and her 16-month-old granddaughter were stranded in New Mexico when the truck overheated. They got going again, only to have the brakes give out.

The travelers repeatedly found themselves marooned without enough food or water. Akers said her son-in-law eventually drove seven hours from Mesa, Ariz., to rescue the toddler. The next day, the truck overheated again outside Tucson.

Akers said a U-Haul representative declared the vehicle undrivable. Even then, she said, it took two days on the phone to get U-Haul to tow the family to their ultimate destination: Surprise, Ariz.

Instead of the four days she had planned, Akers was on the road for eight, with added hotel, meal and phone bills.

"It was a trip from hell," she said.

Akers recovered the full cost of her rental and some other expenses.

Breakdowns can have consequences beyond inconvenience and delay.

Dr. Omar Danner, his wife and three others were scattered like bowling pins when a big rig plowed into their crippled U-Haul truck during a 2001 move from Birmingham, Ala., to Baltimore.

It was the second defective U-Haul issued to the Danners, according to court records and interviews. The first truck rattled and shook so much that Danner said he went back for another.

The replacement truck had not gone far when smoke began pouring from under the hood. Danner pulled over to the side of Interstate 20 outside Birmingham. Danner; his wife, Jacqueline; two relatives; and a mechanic were in or near the U-Haul when the rig drifted onto the shoulder and rammed it.

More than six months pregnant, Jacqueline Danner suffered head injuries and severe knee damage. She later gave birth to a healthy baby girl.

U-Haul blamed the "unfortunate incident" on the "driver of a tractor trailer who apparently fell asleep at the wheel." The company contributed to a multimillion-dollar settlement paid almost entirely by the truck driver's employer.

'CALLOUS' DISREPAIR

TALMADGE WALDRIP WAS BEHIND the wheel of a U-Haul truck Sept. 20 because his daughter had gotten divorced and needed to move boxes of clothing, books and toys. She couldn't operate the truck's manual transmission, so Waldrip agreed to drive.

Rail-thin and always in motion, Waldrip had been a tax collector and assessor for a small town near Dallas. He later went into the antiques business and planned to move his daughter's belongings to a warehouse where he was opening an antique mart.

He drove off in the U-Haul. His daughter, Annabeth Boyd, drove separately and arrived at the warehouse about five minutes after he did.

In a deposition and in an interview with The Times, Boyd recalled finding her father lying beside the 26-foot truck, conscious but severely injured.

"I was just hysterical," she said. "I could tell his leg was mangled. I didn't want him to raise his head and see what I was seeing.... So I just kept asking him, what's going on, what happened, and are you OK? And he said, 'Could you

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

please call 911?' I said, 'Daddy, I already have.' "

Along with a crushed pelvis, Waldrip suffered a ruptured bladder and fractured vertebrae and had chunks of flesh torn from his right leg. He has been hospitalized for all but nine days since the accident. He can't walk and has more than $1 million in medical bills, his daughter said.

The family has sued U-Haul, contending that the 19-year-old vehicle was "in a callous state of disrepair." The case is awaiting trial.

U-Haul repair records filed in court show that the truck's parking brake had malfunctioned repeatedly in the four years before the accident.

"Park brake wasn't hold," reads an entry dated April 14, 2003. Two months later, an employee wrote: "Parking Brake Will Not Hold."

Each time, mechanics made repairs, but the problem persisted. According to the records, the parking brake had to be adjusted again in October 2005 at 229,849 miles -- just 4,000 miles before Waldrip drove the truck.

About two weeks before the accident, his grandson, Jonathan Simington, used the same vehicle to move furniture and antiques for his grandfather and had a nerve-jangling experience.

In a deposition in March, Simington, 24, testified that he had trouble shifting the truck into first gear and that the side mirror was "flapping around."

Simington said that when he stopped the truck and set the emergency brake, it rolled downhill about 80 feet before he could stop it. After that, he said, he wedged a concrete block behind one of the wheels whenever he parked on an incline.

He said he told the U-Haul dealer about the problem but wasn't sure the dealer heard him.

U-Haul has denied responsibility for the accident and said in court papers that there was no evidence it was "aware or should have been aware" of any problems with the emergency brake.

Boyd said her father was too sick to be interviewed. She described him as emotionally devastated by the accident.

"He was a man that could not sit still for a minute. He needed to be busy all the time," she said. "Now he feels helpless. Everybody has to do everything for him, and that's not who he was his entire life."

SAFETY CHECKS

EVERY TRUCK OR TRAILER that rolls off a U-Haul lot is supposed to bear evidence of a recent safety check. Many do not.

Company policy calls for trailers to undergo a "safety certification" at least once every 30 days. The same applies to trucks picked up and dropped off at the same location. Trucks rented for one-way trips are supposed to be certified at least once every 60 days.

In internal documents and court testimony, U-Haul has described the system as a cornerstone of its maintenance program. An employee manual called it "the essential foundation for performing all other safety inspections."

In a safety certification, U-Haul agents check brakes, tires and other key components. Then they are supposed to affix a sticker to the equipment that shows the month, week and year of the inspection.

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

The truck Waldrip rented was more than a month overdue for a certification. The Times survey found similar problems on a bigger scale.

Combing residential streets, parking lots and highway rest areas for U-Hauls, Times staffers checked the safety certifications on 207 trucks and trailers in January and February.

Most of the vehicles were in Southern California; others were in Maryland, Georgia, Washington, Texas, Virginia, Delaware and the District of Columbia.

About half the trucks and more than three-fourths of the trailers were overdue for safety certifications, according to the stickers. One-fifth of the vehicles had not had these inspections in at least six months.

They included a truck on a Northridge street with a sticker showing it was last certified in November 2005; a trailer parked at a McLean, Va., town house complex that was last inspected in June 2006; and a truck parked at an Ikea store in Atlanta that was last certified in April 2006.

It was unclear whether the trucks were rented for local use or one-way trips, so U-Haul was given the benefit of the doubt: Trucks were considered to be in compliance if they had been certified within the preceding 60 days. Even by that standard, 80 of 163 trucks -- 49% -- were overdue.

U-Haul's trailers fared especially poorly. Only seven of 44, or 16%, bore evidence that they had been certified in the previous 30 days. Twelve had not been certified in at least six months, according to their stickers. Sixteen had no stickers at all.

In response to The Times' findings, U-Haul said that in some cases, stickers may have fallen off or agents may have checked equipment but failed to attach a sticker.

Former U-Haul employees, however, said the opposite sometimes happened: They would apply and mark stickers without having completed an inspection. U-Haul said such sources were not reliable.

The company also downplayed the importance of safety certification, describing it as only one of several overlapping procedures designed to keep equipment running well.

For instance, U-Haul requires agents to do a "receive and dispatch" check when equipment is returned. Customers are asked whether they had problems, and agents are supposed to examine essential features such as lights and tires.

Trucks are also supposed to have preventive maintenance, including inspection of the brakes, transmission and suspension, at intervals of 5,000, 15,000 and 30,000 miles.

Finally, trucks must be inspected once a year to ensure they meet U.S. Department of Transportation safety requirements. U-Haul mechanics or private garages perform these inspections.

Dave Adams, a longtime senior U-Haul manager in the Bay Area who quit after a 2002 demotion, said routine maintenance procedures such as "receive and dispatch" checks and safety certifications were "a heck of a good-looking program on paper.'"

He said the reality was different. "More often than not, when the equipment did arrive, it was not safety-checked."

" 'Sprinkle holy water on it' was the expression," Adams said. "It's truly a matter of people just not having the time and resources to get it done."

Ed O'Toole, a former longtime U-Haul executive in Northern California, said: "Safety was a big, big concern of the organization. It's not cost-effective for them to have a piece of equipment that breaks down."

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

But he acknowledged that in the rush to provide trucks and trailers to customers, "there were probably pieces of equipment that got rented out that shouldn't have been."

U-Haul strives to keep costs low so it won't lose business to rivals and so people will rent equipment rather than borrow it from friends or family. One result is modest paychecks, tight staffing and high turnover.

"U-Haul's turnover was just outrageous," said Jim Buell, a former senior executive who supervised operations in California and three other states until 2004.

"You couldn't possibly keep people trained. You've got employees who don't even know how to find the dipstick under the hood of a truck and they're being asked to do a full safety certification."

In 2005 testimony, U-Haul official Russell Johnson said a training program for trailer mechanics had to be canceled because too many trainees were leaving the company.

U-Haul said that average employee tenure is about five years and that turnover is not a problem.

Ryan Keefer, 22, who said he earned about $7.50 an hour working at a company-owned U-Haul center in Poway in San Diego County in 2003 and 2004, described the place as "extremely understaffed."

"Working under conditions like these would often cause me to question whether I hooked the trailer up right due to a lack of proper training, or it would cause me to rush through certain jobs because of the pressure of constant waiting customers," Keefer said in a posting on a Web forum.

"After a month at the job and barely knowing what I'm doing, I already had seniority and was training people."

In an interview, Keefer said employees at the center routinely skipped safety checks before renting equipment and put on certification stickers without doing inspections.

He recalled an angry customer whose trailer had decoupled and damaged his rear bumper. The hook-up had been done by a brand-new employee.

"He didn't know what he was doing," Keefer said.

Tammie Wise, a former U-Haul center general manager in the East Bay and a onetime U-Haul dealer, said that at the busiest times, "it hardly ever happened that trucks got checked."

"There was no time to check the tires or anything like that," she said. "We would at least clean it so it looked presentable."

'HANGING PAPER'

LEE TAYLOR, a U-Haul shop foreman, rented a company truck to move in 2001. His friend and co-worker, Johnny Williams, was driving the truck when he rear-ended Taylor's pickup.

Taylor suffered shoulder, back and neck injuries and sued U-Haul, contending that the truck's brakes failed.

Two mechanics testified that while working on the truck, they documented brake maintenance that they hadn't done. One of the mechanics called this "hanging paper" and said it was "the only way we'll keep our job."

U-Haul mechanics are rated on efficiency, with time limits for specific tasks. Missing targets can lead to dismissal, so the pressure to perform can be intense.

U-Haul blamed Williams for the crash. But a jury found U-Haul liable and awarded Taylor $1.5 million in

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

compensatory damages. Before the jury could decide on punitive damages, U-Haul reached a confidential settlement of the entire case.

Steve Taub, U-Haul's assistant general counsel, described "hanging paper" as "clearly an unacceptable practice," but said the testimony in Taylor's case represented "a single and isolated allegation."

It was not the only time such allegations have surfaced, however.

Bonita Michelle Moss was killed in Atlanta in 1999 when another vehicle pushed her car into the path of a U-Haul truck. The driver of the U-Haul hit the brakes but couldn't stop in time.

Moss' son and niece were also killed, and a nephew was seriously injured. Moss was 8 1/2 months pregnant; her baby was delivered but suffered brain damage and died 3 1/2 years later.

Moss' family sued U-Haul, contending that the truck's power brakes weren't working and that maintenance records showed recurring brake problems.

U-Haul denied responsibility for the accident. It said the 1989 truck, which had been driven 131,000 miles, would have had adequate braking power even if the power brakes had failed.

Edward Hicks, a former U-Haul mechanic in Atlanta, testified for the plaintiffs that maintenance of the company's trucks was "quite poor." Hicks said his name had been forged several times on repair records to make it appear he had performed work when he hadn't.

Hicks, who left U-Haul in 1999 in a dispute over a medical leave, said it was common for mechanics to falsify repair records.

"We would get the truck and find out nobody touched the brakes," he said. "Or they said that they replaced this or that. And it wasn't done."

Without admitting liability, U-Haul settled the Moss suit in 2004 for an undisclosed sum.

Four former U-Haul mechanics, each with at least 10 years' tenure, told The Times that mechanics "hung paper" to maintain efficiency ratings. Some said this was especially common with older trucks that can require time-consuming repairs.

"I would never rent a U-Haul truck," said David Esquivel Jr., who was a U-Haul mechanic in Fremont, Calif., before being fired under disputed circumstances during a union organizing campaign in 2004. "It's not dependable."

Darryl Stasher, formerly a top U-Haul executive in Mississippi, said he was accused of "hanging paper" when the company fired him in 2001. Stasher, who worked for U-Haul more than 17 years, said that the charge was a pretext in his case, but that the practice was rampant.

"They set standards and guidelines that, in reality, they knew were not happening," he said. "All these trucks were breaking down the day after they were rented, and after they said maintenance had been performed."

DEALER NETWORK

ONLY ABOUT A THIRD of U-Haul's independent dealers are automotive businesses like gas stations and repair shops. Many others aren't equipped to fill a tire. Their equipment is maintained by U-Haul field personnel or sent to company-owned repair shops.

But the dealers have responsibility for making sure rental equipment is safe. They are supposed to perform the

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

"receive and dispatch" inspections and be able to safely hook trailers to customers' vehicles, among other duties. U-Haul depends on them to call safety problems to its attention.

U-Haul's reliance on this network has undermined vehicle maintenance and customer service, former employees say.

"They wanted so many dealers," said Buell, the former senior executive. "They didn't care if it was a convenience store, a nail salon or a liquor store."

Buell said he was fired after 19 years with the company for keeping inactive "paper dealers" on the books -- a practice he said was pervasive to support the company's claim to have more than 15,000 rental locations.

U-Haul said it was not aware of such a practice.

Under Shoen's leadership, U-Haul has grown from 4,600 outlets in 1987 to nearly 16,000.

Shoen said expansion of the dealer network has not impaired service or safety. Many dealers have deep roots in their communities and an abiding concern for their customers, he said.

Unlike people who buy a franchise, dealers don't invest to become part of U-Haul, which for most is a small side business. They make their money from commissions on each rental.

Jeff Rodriguez, who runs a plumbing and storage business in Freedom, Calif., said he quit last year after 18 months as a U-Haul dealer because there were too many headaches. He complained about getting no training and about irate customers arriving with reservations he wasn't told about and couldn't fill.

"Nobody showed up to tell us anything," Rodriguez said. "And nobody over the phone knew anything."

Steve Eggen, co-owner of an Alameda party supply company that was a U-Haul dealer for 31 years, said equipment would sit idle on his lot for weeks at a time because U-Haul personnel were too busy to fix it or get it to a company-owned repair shop.

"Sometimes we became a parking lot for downed trucks," he said.

In 2005, Eggen and his brother had had enough. They switched to Budget.

'AVOID HILLS'

BRIAN MARTIN BOOKED a truck weeks in advance to move from Tehachapi to Salt Lake City last Labor Day weekend. A day before the move, the 33-year-old chiropractor learned from U-Haul that he'd have to pick the truck up in Ridgecrest, 74 miles away.

He had barely turned the key when the truck's "check engine" light and a warning beep turned his annoyance to alarm.

He said the dealer told him not to worry -- the truck had just been serviced and he could crank up the radio to drown out the beeping. When Martin complained that the air conditioning didn't work, the dealer said there was no one there to fix it.

With the temperature above 100 degrees, Martin drove into the Mojave Desert on California 178. After about 10 miles, the truck blew a hose. Amid billowing smoke and steam, Martin eased the truck out of traffic with a highway patrolman's help.

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

He eventually made it to Salt Lake City in a newer truck provided by another U-Haul dealer.

U-Haul said the engine in Martin's truck was destroyed by the heat and his bad experience resulted, in part, from renting "in a rural area on the busiest moving week of the year."

U-Haul had unusual advice for Jenifer R. McCormick as she struggled with a balky truck in Tennessee: "Avoid hills."

She and her husband waited hours for the truck they had reserved to move from Texas to Washington, D.C., in 2004. That turned out to be the least of their problems.

First, the truck's alternator belt gave out, requiring an emergency repair on the shoulder of the interstate. Back on the road at 2 a.m., the couple discovered the power brakes and steering were gone.

They limped into Memphis and waited nearly a day for more repairs. Later in the trip, a mechanic told them the truck was out of engine coolant and motor oil.

It was on a call to U-Haul's emergency help line that McCormick said she was given the impossible advice to avoid hills in mountainous Tennessee.

When she arrived days late in Washington and complained to U-Haul, she said she was told that reaching her destination should be "good enough." Later, she got a partial refund.

"This company is the most miserable company I have ever had the misfortune of being involved with," McCormick said in a letter to the Texas attorney general's office. "Their business practices are despicable in almost every respect. I feel very sorry for their employees who must withstand irate customers at every turn."

alan.miller@latimes.com

myron.levin@latimes.com

--

Times researchers Janet Lundblad in Los Angeles and Sunny Kaplan in Washington contributed to this report.

--

The following contributed to The Times' field survey of U-Haul trucks and trailers: researchers JENNY JARVIE in Atlanta, LIANNE HART in Houston, NONA YATES in Los Angeles and LYNN MARSHALL in Seattle; photographer AL SEIB; and reporters WALTER F. ROCHE JR. and CHUCK NEUBAUER in Washington, D.C.

--

()

Safety certified?

--

Results of a Times survey of more than 200 U-Haul vehicles. Trailers are supposed to be certified as safe every 30 days and trucks at least every 60 days.

--

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

Trucks - 163 surveyed

In compliance: 47%

Not in compliance: 53%

--

Trailers - 44 surveyed

In compliance: 16%

Not in compliance: 84%

--

Sources: Spot check of U-Haul vehicles in California, Maryland, Georgia, Washington, Texas, Virginia, Delaware and the District of Columbia, conducted by Times staff members in January and February.

--

()

'It was a trip from hell'

For Cheryl Akers, everything that could go wrong did during her 2002 move in a U-Haul truck from Michigan to Arizona.

1) July 29: Akers departs in a U-Haul truck accompanied by her daughter and her 16-month-old granddaughter.

2) July 30: Grinding gears signal a transmission leak in Tulsa. Truck is repaired.

3) July 31: Truck breaks down again east of Amarillo, Texas, leaving the family stranded for hours in 95-degree heat awaiting a tow truck. Exhaust repairs take a day.

4) Aug. 3: Truck overheats outside Albuquerque. Given overheating problems, Akers decides to go hundreds of miles out of her way to avoid a mountainous area in Arizona.

5) Aug. 3: Truck brakes fail less than 200 miles later near Elephant Butte, N.M., and it's towed again. Akers' son-in-law drives 450 miles to pick up Akers' granddaughter, arriving at 2 a.m.

6) Aug. 4: Truck overheats outside Tucson. A U-Haul representative declares it undrivable. Akers says the U-Haul call center advises the women to sleep in the truck. Driving slowly and stopping often, Akers gets to a motel in Casa Grande.

7) Aug. 6: Truck is towed to Akers' final destination, Surprise, Ariz. Akers' harrowing journey finally ends -- four days later than planned. U-Haul eventually refunds $1,346 to cover the full rental cost and one night in a hotel.

--

Sources: Akers' complaint to the Better Business Bureau and interviews. Graphics reporting by Alan C. Miller and Sunny Kaplan

--

DANGER IN TOW; Upkeep lags in U-Haul's aging fleet; Many trucks have high mileage, and The Times found safety checks were often overdue. Customers describe breakdowns and accidents. Los Angeles T

About this series

Times reporters Alan C. Miller and Myron Levin reported in seven states and reviewed thousands of pages of legal filings, police reports and other records, including consumer complaints filed with the Better Business Bureau. They interviewed more than 200 people, including about 60 current and former U-Haul employees and dealers. They also spoke at length with senior U-Haul executives and toured company facilities in Phoenix.

SUNDAY

How U-Haul policies have increased the risk of towing accidents.

TODAY

An aging fleet and spotty maintenance result in breakdowns and worse.

TUESDAY

After accidents, U-Haul has repeatedly lost or spoiled evidence.

**GRAPHIC:** GRAPHIC: MAP:'It was a trip from hell'; Aker's route from start to end  CREDIT: Raoul Ranoa Los Angeles Times PHOTO: STRANDED IN THE DESERT: Akers holds Stefany, then 16 months old, after their truck broke down again along Interstate 25 outside Albuquerque. Akers' son-in-law finally drove the seven hours from Mesa, Ariz., to rescue the toddler.  PHOTOGRAPHER: Akers family PHOTO: MAINTENANCE WORK: At U-Haul's Paramount Manufacturing in Long Beach, Robert Ventress carries a tire to a vehicle being serviced before it is rented out again. U-Haul says it is investing heavily to modernize its fleet.  PHOTOGRAPHER: Al Seib Los Angeles Times PHOTO: A BAD MOVE: Cheryl Akers traveled across the country in 2002 with her daughter, Christina Alspaugh, and Alspaugh's daughter Stefany. Their U-Haul truck suffered the equivalent of multiple organ failure, repeatedly marooning the family in the Southwest in summer. It eventually had to be towed to their destination. PHOTOGRAPHER: Al Seib Los Angeles Times PHOTO: BROKEN: Talmadge Waldrip remains hospitalized nine months after a parked U-Haul truck rolled over him. His family says the emergency brake failed. U-Haul has denied responsibility for the accident.  PHOTOGRAPHER: Dave Einsel For The Times

**LOAD-DATE:** June 26, 2007

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| ) |  |
| MICHAEL MARGOLIS, ) |  |
| on behalf of himself and others ) |  |
| similarly situated, ) |  |
| Plaintiff, ) |  |
| v. ) | Case No. 1:07-cv-1648-RMC |
| ) |  |
| U-HAUL INTERNATIONAL, INC., ) |  |
| ) |  |
| Defendant. ) |  |

_____)

**[PROPOSED] ORDER**

This matter having coming before the Court on Defendant's Motion to Strike the

Class Allegations and to Dismiss the Complaint, and the Court having reviewed the

Motion and supporting Memorandum and the Plaintiff's Response in Opposition and

supporting Memorandum, and for good cause shown:

**IT IS SO ORDERED** that Defendant's Motion to Strike the Class Allegations

and to Dismiss the Complaint is hereby **DENIED**.

Dated: This _____ day of _____, 2007.

_____
U.S.D.J.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2007, a copy of the foregoing was served

upon all counsel of record through the Court's electronic filing system and via electronic

mail:

David Zetoony
Bryan Cave LLP
700 13th St. N.W. Ste 700
Washington, D.C. 20005
(202) 508-6030 (phone)

Of Counsel:
Lawrence G. Scarborough, Esq.
Bryan Cave LLP
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004
(602) 364-7137 (phone)

<u>/s/Steven A. Skalet</u>
Steven A. Skalet
